[615 NYS2d 689]

ARTWEAR, INC., Appellant, v FREDERICK HUGHES, Individually and as Executor of ANDY WARHOL, Deceased, et al., Respondents, et al., Defendants.

First Department, August 25, 1994

### APPEARANCES OF COUNSEL

*Nehemiah S. Glanc* of counsel, New York City *(Aaron Richard Golub,* attorney), for appellant.

*Paul J. Hanly, Jr.,* of counsel, New York City *(Lewis S. Fischbein* on the brief; *Coblence & Warner,* attorneys), for Frederick Hughes and others, respondents.

*Christopher Smith* of counsel, New York City *(Beth D. Jacob* on the brief; *Carter, Ledyard & Milburn,* attorneys), for The Andy Warhol Foundation for the Visual Arts, Inc., respondent.

### OPINION OF THE COURT

SULLIVAN, J. P.

Plaintiff Artwear, Inc., a New Mexico corporation licensed to do business in New York, which manufactures and sells apparel, particularly "T-shirts", sues to recover damages arising out of the refusal of the estate of Andy Warhol to approve any of its products for distribution and sale under an agreement it had with defendant Schlaifer Nance & Company, Inc. (SNC) to act as SNC's sublicensee in the manufacturing and distribution of T-shirts in the United States utilizing images created by the deceased artist under a license agreement between SNC and the estate.

The license agreement between SNC and the estate, entered into on or about November 13, 1987, granted to SNC certain exclusive rights to use and license others to use reproductions of and copyrights to works of art created by Andy Warhol and trademarks associated with him on and in connection with

various products. The license agreement provided, in pertinent part, that SNC had the right to engage sublicensees to manufacture and distribute licensed products and that the estate would have the final right of approval, not to be unreasonably withheld, of any licensed products proposed by SNC. Thereafter, on or about December 18, 1989, SNC and Artwear entered into a sublicense agreement with respect to the manufacture and distribution of T-shirts utilizing the Warhol copyrights and trademarks. Artwear paid SNC $50,000 on the signing of the sublicensing agreement, of which $25,000 was forwarded to the estate.

Unlike the license agreement, which imposed a requirement of reasonableness upon the estate in withholding approval of a product, the sublicense agreement did not impose any such requirement. Approval could be "granted or withheld as [SNC], in its sole discretion, in conjunction with [the estate], may determine." Artwear "agree[d] to be subject to control and approval * * * by [SNC] as to the nature and quality of the [l]icensed [p]roducts bearing the [Warhol artwork]." Under the sublicensing agreement, SNC's approval had to be obtained as to the concept, final design, prototype and production sample of each licensed product. Artwear could "not proceed beyond any of the [enumerated] stages where approval [was] required without first securing the prior express written approval of [SNC] for that stage." In addition, the estate had the final right of approval for each phase.

Unfortunately for Artwear, by the time the sublicense agreement was entered into, the relationship between SNC and the estate had deteriorated and none of Artwear's products was ever approved. Artwear claims that by the time it learned in February 1990 that the estate had not approved any of the T-shirts it had developed for sale, it had already embarked on a promotional campaign and incurred more than $250,000 in expenses in the manufacture of the Warhol T-shirt.

On February 16, 1990, SNC commenced an action against the estate in the United States District Court for the Southern District of New York, alleging, *inter alia,* that the estate had breached the license agreement and engaged in tortious conduct. On February 20, 1990, it also brought an arbitration proceeding before the American Arbitration Association, Atlanta Regional Office, on certain of the claims asserted in the Federal action against Frederick Hughes, as the executor of the estate, and, on June 18, 1991, was awarded $4,086,646,

including punitive damages, which has been paid in full, based on a finding that the estate had breached the licensing agreement and conducted itself "in bad faith and in willful disregard of SNC's rights" by unreasonably rejecting products and failing to cooperate and assist in promoting the licensing program. The arbitration panel further found that the estate's disapproval of Artwear's T-shirts was motivated by its desire "to be rid of SNC".

Artwear then commenced this action against the estate and its representatives, individually, the estate beneficiary, The Andy Warhol Foundation for the Visual Arts (The Foundation), and SNC, asserting, in an amended complaint, six causes of action. In the first cause of action, Artwear, claiming to be a third-party beneficiary of the license agreement between the estate and SNC, seeks to recover damages for breach of that agreement and points to the arbitration award as proof of the estate's wrongdoing. The second cause of action alleges a prima facie tort against the estate and The Foundation based on the intentional breach of the licensing agreement "for * * * the purpose of increasing their own executor and sale commissions and [to enhance the] value of their [Andy Warhol] collections." The third cause of action alleges, based on third-party beneficiary status, a breach of the license agreement as well as the sublicense agreement. The fourth (against SNC only) and fifth (against the remaining defendants only) causes of action allege fraud while the sixth cause of action alleges tortious interference with contractual rights based on the estate's breach of the license agreement by unreasonably disapproving of Artwear's Warhol design T-shirts; this disapproval is alleged to be a direct cause of SNC's nonperformance of the sublicense agreement. The estate and the individual defendants, collectively, and The Foundation separately moved, pursuant to CPLR 3211, to dismiss the amended complaint for, *inter alia,* failure to state a cause of action.

■ The IAS Court granted the motions, finding, as dispositive of the first and third causes of action, that Artwear was a mere incidental beneficiary of the license agreement and therefore without standing to sue for its enforcement and that neither the estate and the individual defendants nor The Foundation were parties to the sublicense agreement. In dismissing the second cause of action alleging prima facie tort, the court cited Artwear's failure to plead special damages and allege "disinterested malevolence" as the defendants' sole motivation. As for the fraud claims, the court, noting that the

fourth cause of action contained no allegations against the estate, the individual defendants or The Foundation, dismissed said cause as against them and Artwear raises no issue with respect thereto on appeal.

■ The fifth cause of action alleges that the estate and the individual defendants and The Foundation knew when they accepted the $25,000 paid under the sublicense that the estate would never consent to the approval of the T-shirt project but nevertheless permitted the agreement to be entered into. The court found that Artwear did not allege in adequate detail a knowing misrepresentation of an existing fact by these defendants; that there was no allegation that SNC was acting for said defendants when it supposedly made the misrepresentation to Artwear and that Artwear did not allege reliance upon any specific representation made to it in entering into the sublicense agreement. As to the merits of the claim that these defendants deceitfully omitted to disclose the fact that approval would not be given, the court found that in the absence of a confidential or fiduciary relationship they had no duty to disclose. With respect to the sixth cause of action for tortious interference, the court found the claim to be fatally defective given Artwear's failure to allege that the defendants' actions were intended to harm it without economic or other lawful excuse. Artwear appeals. We affirm.

■ The complaint was properly dismissed and we agree with the IAS Court's analysis. Only the dismissal of the sixth cause of action requires any discussion. In considering its merits, it is necessary, however, to review the deficiencies in Artwear's claim to third-party beneficiary status.

Artwear cannot, as it attempts to do in its first and, in part, third cause of action, qualify for third-party beneficiary status* since it is, at best, an incidental beneficiary of the license agreement, that is, a third party who, although neither the promisee nor the one to whom performance is to be rendered, may derive a benefit from the performance of a contract. *(Airco Alloys Div. v Niagara Mohawk Power Corp.,* 76 AD2d 68, 79; Restatement [Second] of Contracts § 302 [2].) Only an intended beneficiary of a contract may maintain an action as a third party; an incidental beneficiary may not. *(Alicea v City*

---

* Of course, no contract claim, based on third-party beneficiary status or otherwise, would lie against the two individual defendants, who are neither alleged to be nor are parties to the license or sublicense agreement. *(See, Gottehrer v Viet-Hoa Co.,* 170 AD2d 648.)

*of New York,* 145 AD2d 315, 317.) In order for a contract to confer enforceable third-party beneficiary rights, it must appear "that no one other than the third party can recover if the promisor breaches the contract" or the contract language should otherwise clearly evidence "an intent to permit enforcement by the third party." *(Fourth Ocean Putnam Corp. v Interstate Wrecking Co.,* 66 NY2d 38, 45.) The license agreement at issue does neither.

Artwear cannot demonstrate that no one other than it can recover for the estate's alleged breach of the license agreement because SNC has already secured a recovery. Thus, by virtue of its payment of the arbitration award the estate's contractual obligations to SNC under the agreement have already been discharged. Moreover, a third-party beneficiary, whose rights are derivative, is subject to the same defenses as are available to the contracting party. *(See, Dunning v Leavitt,* 85 NY 30, 35; 22 NY Jur 2d, Contracts, § 281.) Since the estate has fully paid the judgment entered on the award and a satisfaction of judgment has been duly filed, Artwear is subject to the same defense, namely, payment and discharge, to which SNC would be subjected had it commenced another action or proceeding on the same claim.

Moreover, nothing in the agreement reflects an intent that the estate satisfy some debt owed by SNC to Artwear or that the estate's performance benefit Artwear. While the license agreement specifically authorizes SNC to use sublicensees to carry out its contractual duties, the provisions permitting such use are obviously intended to effectuate SNC's performance and thereby generate revenues for both SNC and the estate. Any benefit to those selected as SNC's sublicensees is an incidental by-product of the agreement.

In that regard, Artwear's reference to several provisions of the license agreement as reflective of an intent to confer third-party beneficiary status on the sublicensees is misguided. For instance, the license agreement defines "Independent Services" as "services performed by [SNC] for the benefit of a sublicensee or any other third party in connection with [Warhol's artwork,] which services are beyond the normal scope of licensing activities." The agreement provides elsewhere that "Independent Service Fees," defined as "compensation or payments received by [SNC] for Independent Services," will not adversely effect the sums received by SNC from third parties from the exploitation of the artwork because Independent Services are outside the normal scope of licensing activities.

Thus, Independent Services are those performed for third parties by SNC only, solely for its account and without any relevance to the licensing activities or performance contemplated by the license agreement. Any benefit to a sublicensee is incidental to such unrelated activities of SNC and is not a benefit intended by the contracting parties to be conferred upon the third party.

Similarly, the license agreement provision that SNC and the estate shall mutually agree on the basic form of the sublicense agreements to be entered into by SNC, reserving to SNC the right to negotiate such changes to the form as are not in conflict with the license agreement as SNC, in its sole discretion, shall determine to be appropriate, reflects, not an intent to benefit sublicensees, but, rather, the fact that sublicensees are to be the mechanism to exploit Warhol's artwork for the enrichment of SNC and the estate. The provision calling for SNC's best efforts to enter into agreements with sublicensees generating the payment of minimum guaranteed royalties to SNC in an amount sufficient to result in the estate's receipt of not less than $1,500,000 in compensation merely evinces an intent to benefit the estate and SNC, not the sublicensees. The provision requiring SNC to furnish the estate with a copy of each sublicense was intended to allow the estate the opportunity to monitor the amount of royalties due, not to benefit the sublicensee.

This Court and others have consistently held in instances where the contract in issue makes clear that a third party will be retained to assist in the performance by the promisee that such third parties are not intended beneficiaries of the main contract. (See, e.g., Oursler v Women's Interart Ctr., 170 AD2d 407 [artists held to be mere incidental beneficiaries of contract between not-for-profit corporation and National Endowment for the Arts, even though latter awarded grant to not-for-profit corporation to support artists' project]; Alicea v City of New York, 145 AD2d 315, supra [employees of company hired to maintain City's parking meters were not third-party beneficiaries of employer's contract with City]; Legal Aid Socy. v Economic Opportunity Commn., 132 AD2d 113 [3d Dept].)

In Airco Alloys Div. v Niagara Mohawk Power Corp. (76 AD2d 68, supra), the Court held that industrial electricity customers were not, ipso facto, third-party beneficiaries of a contract between the Power Authority and Niagara Mohawk, even though, just as the estate had the authority to approve sublicensees under the license agreement, the contract pro-

vided that Niagara Mohawk would sell power to the industrial customers and that the Power Authority had the right to approve the customers and the amount of power sold to them. In so ruling, the Court noted that the contract did not "designate or specifically refer to the [customers] as third-party beneficiaries, but gives the power to the parties of the contract to determine the specific industries and their allocations." *(Supra,* at 80.)

In this connection, it is well settled that the subcontractor or supplier of a general contractor on a construction project is not invested with third-party beneficiary status. *(See,* Restatement [Second] of Contracts § 302, illustration 19, at 444.) "The text writers have uniformly designated these third parties only as incidental beneficiaries and not infrequently have posited the situation wherein the subcontractor sues the owner as an example of an action by an incidental beneficiary." *(Port Chester Elec. Constr. Corp. v Atlas,* 40 NY2d 652, 656; *see, also, Arrow Louver & Damper Div. v New York City Tr. Auth.,* 106 AD2d 533.)

Equally unavailing is Artwear's alternate argument that it is a third-party beneficiary of the license agreement because it relied on the agreement as conferring rights upon it. Aside from the lack of legal support for such a premise, any reliance upon the estate's grant to SNC of the right to contract with sublicensees and the estate's implied approval of Artwear as a sublicensee would in no way lessen the requirement of Artwear's obtaining the specific approval of its Warhol T-shirts, which, as noted, could be withheld, even unreasonably.

*McClare v Massachusetts Bonding & Ins. Co.* (266 NY 371), which Artwear cites in support of its estoppel argument, provides no additional support. There, the Court found that the plaintiff, a creditor of the principal and third-party beneficiary of the surety bond, had supplied the principal with labor and material in reliance upon the bond. Estoppel was used to counter the argument that the bond was unenforceable because it was not specifically provided for in the statute creating and defining the powers of the State Athletic Commission, which had required the bond to secure, *inter alia,* payment of the principal's debts. Thus, estoppel was used in determining the scope of the bond's coverage, not in assessing whether the plaintiff was a third-party beneficiary thereof. Clearly, it was.

Contrary to Artwear's claim, the arbitration panel did not find Artwear to be a third-party beneficiary of the license

agreement. The panel found only that the estate breached its obligations to SNC under the license agreement. In any event, even if it had found such a relationship, the panel's findings cannot be given collateral estoppel effect on the issue of Artwear's status as a third-party beneficiary for the reason that, *inter alia,* a finding of such status was not necessary to the panel's determination. *(See, Schwartz v Public Adm'r of County of Bronx,* 24 NY2d 65, 71.)

Artwear's cause of action for tortious interference with contractual rights, intertwined with its claim to third-party beneficiary status, fares no better. The elements of a tortious interference claim are well known: the existence of a valid contract between the plaintiff and a third party, the defendant's knowledge of that contract, the defendant's intentional procurement of the third party's breach of the contract without justification and an actual breach of the contract and damages resulting therefrom. *(Israel v Wood Dolson Co.,* 1 NY2d 116, 120.)￼ In the matter at hand, the latter two elements are manifestly absent. While the amended complaint does allege a breach of the license agreement, it fails to allege that the estate intentionally induced a breach of the sublicense agreement. Nor did the arbitration panel, upon whose award Artwear relies, find that the estate induced SNC to breach the sublicense agreement or, for that matter, that SNC breached the sublicense agreement at all.

Faced with these pleading defects, Artwear argues that neither it nor SNC was able to perform under the sublicense agreement because of the estate's breach of the license agreement. Artwear's cause of action for tortious interference with contract is, therefore, by its own terms, based on the estate's alleged breach of the license agreement, which breach brought about SNC's failure to perform the sublicense agreement. In reality, this is nothing more than a claim for damages incidentally flowing from the breach of the license agreement, to which Artwear was not a party and of which it is not, for the reasons indicated, a third-party beneficiary.

In similar circumstances, the Court of Appeals has held that a cause of action by a subcontractor for intentional interference with contract does not lie. In *Alvord & Swift v Muller Constr. Co.* (46 NY2d 276), a subcontractor on a construction project with no privity of contract with the owner, claiming damage due to construction delays, sued the owner for alleged tortious interference with its subcontract with the general contractor. Notwithstanding the invocation of the label "tor-

tious interference," the Court found the claim to assert essentially the owner's failure to perform its agreement with the general contractor. In rejecting the claim, the Court noted, "There has never been any indication that an intentional tort was committed in the sense of an intention to harm plaintiff without economic or other lawful excuse or justification." *(Supra,* at 282.) The Court held that the claim was barred for lack of privity of contract with the owner and found that the subcontractor was an incidental beneficiary of the main contract. In language dispositive of Artwear's tortious interference claim here, the court held, "There exists * * * no tort liability to incidental beneficiaries not in privity." *(Supra,* at 282; *see also, Martirano Constr. Corp. v Briar Contr. Corp.,* 104 AD2d 1028.) There is no allegation or, indeed, any suggestion here of an intent on the estate's part to harm Artwear without business or other justification.

Thus, Artwear, a sublicensee legally indistinguishable from the subcontractor in the contractor/subcontractor relationship in *Alvord,* cannot transform an alleged breach of the license agreement by the estate, a party with which it is not in privity, into a tort claim against that party. Artwear's remedy is against the party with whom it dealt, SNC.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered May 17, 1993, which granted the motions to dismiss the amended complaint should be affirmed, without costs or disbursements.

CARRO, WALLACH, RUBIN and WILLIAMS, JJ., concur.

Order, Supreme Court, New York County, entered May 17, 1993, affirmed, without costs.